## THE PEOPLE v. GEORGE POTTER.

The power of pardoning convicts, conferred on the governor by article three, section five of the Constitution of this State, is not simply a naked power to grant or refuse absolute pardons, but empowers the governor to impose conditions, as the terms on which a pardon shall be effectual.

A conditional pardon, when accepted by a convict, is a contract between him and the State.

Conditions immoral, impossible or illegal, annexed to a pardon, would be void, and the pardon absolute.

Banishment is not a void condition. It is sanctioned by authority, and has been inflicted from the foundation of our government.

The mode of enforcing the condition is by inflicting the original sentence, in case of the condition being violated.

A convict having violated the condition of his pardon, is in the same state in which he was at the time the pardon was granted, viz., under sentence, and should be remanded according to his original sentence.

The court in which he was convicted, or any court of superior criminal jurisdiction, may, in such case, pronounce judgment upon the original sentence, or enforce such judgment already pronounced.

The Supreme Court, and the Court of Oyer and Terminer, possess such jurisdiction.

The proper mode of proceeding pointed out.

THE prisoner was convicted of grand larceny at the September term of the General Sessions of New York, 1844, and sentenced to five years imprisonment in the State prison. Under that sentence he remained in prison until the 12th of April, 1845, when he received a pardon from the governor, "on condition that he should, on or before the last day of the said month of April, depart from and out of the United

States, and never return to the same. And in the event of his not complying with the said condition, the pardon should cease and be inoperative, and he should be arrested and imprisoned according to his sentence."

In November, 1845, the prisoner was arrested in the State of Louisiana, on an indictment preferred against him for another offense, and brought to the city of New York. On his arrival he was committed by the Court of Oyer and Terminer to the custody of the keeper of the city prison of that city. In February, 1846, on his petition to the circuit judge setting forth that he was 'unjustly detained, a writ of habeas corpus was issued to the keeper of the city prison, whose return set forth the following commitments as the authority by which he held the prisoner in custody:

NEW YORK GENERAL SESSIONS OF THE PEACE: *The People of the State of New York* v. *George Potter.* January 8th, 1846. On indictment for an attempt to commit a grand larceny, goods of Edward Jones.

On motion of Jonas B. Phillips, Esq., acting district attorney, ordered that the said George Potter be committed to the custody of the keeper of the city prison in the city of New York, until thence delivered by due course of law.

Extract from the minutes.

HENRY VANDERVOORT, Clerk.

NEW YORK OYER AND TERMINER, January 8th, 1846.
*The People* v. *George Potter.*

It appearing to the court that the said George Potter was convicted of grand larceny at the September General Sessions, 1844, and was sentenced on the 13th day of September, 1844, to be imprisoned in the State prison at hard labor, for the term of five years, and that the said George Potter had received a conditional pardon from the executive of this State, and that he had not complied with said conditions: on motion of Jonas B. Phillips, Esq., in behalf of the district attorney, ordered, that the said George Potter stand committed to the

custody of the keeper of the city prison of the city of New York, until thence delivered by due course of law.

A true extract from the minutes.

HENRY VANDERVOORT, Clerk.

At a Court of General Sessions of the Peace holden in and for the city and county of New York, at the Halls of Justice of the said city, on Tuesday the tenth day of February, in the year of our Lord one thousand eight hundred and forty-six: Present, the Honorable Frederick A. Tallmadge, Recorder of the city of New York, Joseph A. Diver, Bernard J. Messerole, aldermen of said city, Justices of the Sessions.

*The People* v. *George Potter.* The prisoner is arraigned on a former conviction in this court, at the August Term, one thousand eight hundred and forty-four, for grand larceny of the goods and chattels of Abraham Mallory, and for which he was sentenced to be imprisoned in the State prison at hard labor, for the term of five years. Whereupon the district attorney moved that he be arraigned upon the said conviction and that he be required to show cause why he should not be remanded to, and be imprisoned in, the State prison for the residue of the said term, to which the said prisoner objected; first, because the court had no jurisdiction; and, secondly, because a habeas corpus was now pending before his honor the circuit judge of this circuit in the same matter. Whereupon, it is ordered by this court that the said prisoner be remanded to the custody of the keeper of the city prison of the city of New York, upon the said conviction, until he be thence delivered by due course of law.

A true extract from the minutes.

HENRY VANDERVOORT, Clerk.

To that return the prisoner pleaded that at the September term of the General Sessions of New York, 1844, he was convicted of a grand larceny, and sentenced to five years imprisonment in the State prison, that he was immediately, by vir-

tue of that sentence, committed to the State prison, and there remained until the 12th April, 1845, when the governor of the State did execute, grant and deliver to him his certain pardon or act of grace, whereby he pardoned, released and remised him from the said offense, and from all sentences, judgments and executions thereon, on condition that the prisoner should, on or before the last day of the said month of April, depart from and out of the United States, and never return to the same, and in the event of his not complying with the said condition the pardon should cease, and be inoperative, and he should be arrested and imprisoned according to his sentence.

The plea further stated that upon the execution and delivery of the pardon to him he was immediately discharged from the State prison and from imprisonment, and so remained until the time of the said several commitments; that on the 28th of April he did depart from the State of New York into the Canadas, and into others of the United States, viz., Missouri, Ohio and Louisiana, and remained out of the State of New York until the 21st of November, 1845, when he was forcibly brought from the State of Louisiana into this State by one of the policemen of New York.

To this plea the district attorney interposed a general demurrer, and the prisoner joined in demurrer.

*T. W. Warner and D. Graham* moved for the discharge of the prisoner:—

1. Because the prisoner had been pardoned by the executive.

2. Because the pardon was absolute, the condition being void for want of power in the government to grant a conditional pardon, and because exile from the United States was beyond his power to enforce.

3. Because there was no power in the courts to enforce the performance of the condition.

*J. McKeon* (district attorney) *and J. R. Whiting, contra.*

*The Circuit Judge :* The commitment by the General Sessions to answer to the second indictment is not complained of by the prisoner on these proceedings, and is to be regarded as legal and valid. He has, however, the right to have the other causes of his detention inquired into and determined. (*Ex parte Badgley,* 7 Cow. 472.)

Those other causes involve the validity of the pardon, and in regard to that, three points are made for the prisoner :

1. That the governor has no right to grant a conditional pardon.

2. That, if he has, he has no power to impose exile or banishment from the United States as a condition.

3. That even if he has the authority denied to him in the foregoing propositions, yet there is no power or jurisdiction in any court or officer to enforce the condition, or a forfeiture which may flow from its violation.

*First.* Has the governor authority to grant a conditional pardon?

His authority in the premises is derived from the Constitution, which, in article three, section five, contains these words: " The governor shall have power to grant reprieves and pardons after conviction, for all offenses except treason and cases of impeachment."

It is contended for the prisoner that this is not a grant to the executive of the pardoning power, which is inherent in the sovereign authority, with all its incidents, but is simply a naked power to bestow or refuse pardons; in the exercise of which, like that of the veto power, he is, as it were, a mere automaton, clothed only with authority to say aye or no to the application to him.

And while it is conceded that by the common law the right to attach conditions is necessarily incident to the pardoning power, it is insisted that the whole power is not by the language of the Constitution vested in the executive, but only the power to grant or deny; and that the rules of the common law do not affect or bear upon this special and limited grant.

This view of the case seems to depend mainly upon a ver-

bal criticism, upon a distinction between the "pardoning power" and the "power to grant pardons."

There are two controlling reasons why the aid of the common law is to be invoked in the decision of this question.

1. Because the words in which this grant of power is conveyed are well known to the common law, and by use and adjudications have obtained a precise and definite meaning.

2. Because the instrument which grants the power, *eo instanti*, makes the common law a part of the law of the land. (1 R. S. 54, art. 7, § 13.)

The word "grant" comprehends something more than the mere execution of the instrument; it includes a delivery of it; and as there can be no delivery without an acceptance, there is necessarily comprehended within the word, the idea that the minds of both parties to the instrument have met, that they have agreed that one shall execute and deliver, and the other shall accept and receive. (Per Marshall, Ch. J., in the *United States* v. *Wilson*, 7 Peters, 156.)

The word "pardon" includes a remission of the offense, or of the penalties, forfeitures or sentences growing out of it, and may be of a part or the whole of these things.

Thus one may be pardoned of the imprisonment, and still be left to suffer the other penalties attached to the offense. In cases of perjury this would still subject the convict to the disability of being a witness.

A convict for life might be set at large and still suffer the penalty of the dissolution of his marriage contract, or the vesting of his property in the hands of administrators or trustees.

And so, under our statute, though the prisoner is pardoned both of the offense and of the penalties, he is not restored to the rights of citizenship unless by the terms of such pardon he shall be so restored. (1 R. S. 127, § 3; *vide*, also, *State* v. *Twitty*, 4 Hawks' N. C. R. 193.)

To "grant pardons" seems then to imply that the sovereign power of the State, or its representative, has executed and delivered, and the prisoner has agreed to accept, and has ac-

cepted, a pardon or forgiveness of the offense which he has committed, or some part of it, and a remission of, and release from, the penalties attached to the offense, or some of them.

Such is the common law definition of the terms in question, and as, by the Constitution, the common law was declared to be the law of this State, I cannot see how that definition can be disregarded in any judicial proceeding; and as that definition was established long before the use of these words in the Constitution, so I cannot well see how it can be argued that the framers of that instrument did not use those words in the sense thus explicitly established.

The whole current of common law authority for very many years is to the same effect. Blackstone, Hawkins, Coke, Chitty, elementary writers, as well as the judges, in pronouncing the decisions of the courts, use the words in the same sense and none other.

The Constitution of the United States, the present and the former Constitutions of this State, and those of every State in the Union, excepting only two, New Hampshire and Massachusetts, use the same expression, "grant pardons," thus, almost universally, signifying that the term has obtained a precise and definite meaning.

Our own statutes, through all the revisions from 1787 to the present time — a period of near sixty years — have been equally guarded in the use of the same terms, and have been explicit in conferring upon the governor the power to attach conditions to his pardons. (3 Greenleaf's Laws of N. Y., Rev. Laws of 1813, 2 R. S. 745.)

The decisions of the courts in our State, in several of the States of the Union, in the courts of the United States, and in the courts of the British empire, have all regarded these words as conveying the right to attach conditions to the grant of a pardon.

In the *People* v. *James* (2 Caines, 57), the prisoner had been pardoned on condition that he would leave the United States in forty days, but neglecting to do so, the same proceedings were had against him that have been had in this case.

In *Pease's case* (3 John. Ca. 333), the court for the correction of errors, in deciding the main point in the case, expressly admit the power of the governor to annex conditions and restrictions to pardons, and say, "The punishment may be mitigated, or it may be changed from imprisonment to voluntary transportation."

In *Smith's case* (1 Bailey, 283, S. C.), a pardon was granted on condition of banishment. The prisoner, as in this case, complied so far as to leave the State, but returned in violation of the condition. On his arrest, it was insisted that the governor had no right to attach conditions, and it was held that, even without the express authority given by the Constitution, the governor would have a right to impose terms, and the court add, "all the common law writers agree to this in so many words." (*See*, also, *Addington's case*, 2 Bailey, 516; *Mary Fuller's case*, 1 McCord, 178; *State* v. *Twitty*, 4 Hawks' N. C. R. 193.)

In the United States Supreme Court, in 7 Peters, 175, Ch. J. MARSHALL says: As this power has been exercised from time immemorial by the executive of that nation whose language is ours, and to whose judicial institutions ours bear a close resemblance, we adopt their principles respecting the operation and effect of a pardon, and look into their books for the rules prescribing the manner in which it is to be used. Mr. Wirt, when attorney-general of the United States, gave it as his opinion that the power to pardon, as given by the Constitution, is the power of absolute and entire pardon. On the principle that the greater power contained the less, he was of opinion that the power of pardoning, absolutely includes the power of pardoning conditionally. Opinions of Attorney-General, 250; Butler, Attorney-General, id. 1034, recommends a law authorizing the President to commute and grant conditional pardons, thus clearly implying that even under a limited Constitution, like that of the United States, the legislature could confer the power on the executive, and Gilpin, attorney-general, id. 1382, in his opinion, recognizes the principle that the rules of the common law govern as to the operation of a pardon.

This principle being thus applicable to the grants of power under a Constitution like that of the United States, which is one of specific grants, and into which the common law has not been specially incorporated, how much more forcibly is it applicable to a Constitution like that of the State, which is general in its nature, which grants the whole legislative power of the sovereign, and which adopts the common law as a component part of itself.

The English books are full of authorities upon the point that a pardon may be extended on any condition, precedent or subsequent, on the performance of which the validity of the pardon will depend. (1 Chitty Cr. L. 773; 2 Hawk Pl. C. ch. 37, § 45; 3 Tomlins, 13; *Cole's case*, in 13 Eliz. 466; *Foxworthy's case*, Holt, 521, in 1 Ann.)

Banishment was first known in England as abjuration, where the party accused fled to a sanctuary, confessed his crime, and took an oath to leave the kingdom and not return without permission. (4 Bl. Com. 333; 3 P. Williams, 37.) This was not as a punishment, but as a condition of pardon. After abjuration was abolished, and about the reign of Charles II., it became usual to grant pardons on condition of banishment, and that the original sentence should be revived on a violation of the stipulations of its remission. (Kel. pre. 4; Williams, J. Felony, VI.; 1 Ch. Cr. 789.) And it was usual to bind the criminal as an apprentice, and both he and his master were liable to severe penalties on his return. Afterward the performance of the stipulation of banishment was enforced by requiring security from him that he would leave the country, and finally the practice settled down to that adopted in this case, namely, that of granting pardons on condition, and enforcing the condition by inflicting the original sentence upon the party, in case of violation.

It seems then that the practice of granting conditional pardons is sustained by the principles of the common law which we have adopted as the law of the land; by the practice of the country whose institution in this regard we have borrowed *in totidem verbis;* by the provisions of the Constitutions of

the United States, and of most of the States of the Union; by the decisions of the courts of the United States, and of our own State, and of other States in the Union; by the enactments of our statute for over half a century, and by the practice of our executive since the formation of our government.

Against this force of authority we are cited only to a possible distinction between the pardoning power and the power to grant pardons — a distinction which, if not merely verbal, is scarcely enough, in the absence of authority, to combat the dictates of good sense — that the injured party has the power to prescribe the atonement upon which his forgiveness shall rest; and that the power of pardoning being a fit one to be entrusted to all governments, humanity and sound policy dictate that this benign prerogative be as little as possible fettered or embarrassed. (Story's Commentaries on the Constitution, § 1492.)

This view of the case sanctioning the authority exercised by the executive in imposing a condition upon the pardon granted to Potter, renders unnecessary a minute examination of another view which has been suggested, and which I will merely mention. It is this, that the power to pardon is incident to the sovereign power of the State, and vested in the legislative authority; that the legislative power of the sovereign people of this State, being by our Constitution vested in the legislature, the power to pardon is in the legislature, notwithstanding the grant also to the executive; that the legislature have a right to delegate the power to the executive to exercise it in accordance with and subordinate to their will, and that they have so delegated it by the statutes which they have passed, and that under the statute the executive has thus obtained authority to impose conditions.

This view may be found to be consistent with the principles of the common law and with the spirit of our institutions, but I do not, under the circumstances, feel called upon to consider or decide upon it.

I ought not to dismiss this part of the case without noticing an objection which was pressed upon me with much earnest-

The People v. George Potter.

ness, to wit, that, banishment being a punishment unknown to our law, the imposition of it as a condition of the pardon was in violation of that provision of our bill of rights which forbids the infliction of cruel or unusual punishments. (1 R. S. 94, § 17.)

There is no doubt that any immoral, impossible or illegal condition would be void. This is a principle of the common law well established. (Com. Dig. Tit. Condition, D; *Pease's case*, 3 John. Ca. 333; *Watson's case*, 9 Ad. & Ell. 731.)

And the general language of the statute, that the governor may grant pardons "upon such conditions, and with such restrictions, and under such limitations as he may think proper," is to be taken subject to this principle. His conditions must not be immoral, impossible or illegal. No authority to impose such conditions has been or could be conferred upon him by the statute. Therefore the argument of the prisoner's counsel, drawn from the general language of the statute, that it was void because it authorized the governor to impose unusual or cruel punishments, necessarily falls to the ground. These barbarous practices are impliedly excluded from the enactment unless it should actually express them. (Per Ld. Denman, 9 A. & E. 783.)

No principle is better established than this, that statutes must be so construed that all their parts, when *in pari materia*, shall be allowed to operate, and the effect of that rule on these statutes is simply that the governor may grant a pardon on a condition which does not subject the prisoner to an unusual or cruel punishment. Banishment is neither. It is sanctioned by authority, and has been inflicted, in this form, from the foundation of our government. (*Smith's case*, 1 Bailey, *supra; James' case*, 2 Caines, 57; *Pease's case*, in the court of errors, 3 John. Ca. 333; 2 Bailey, 516; 1 McCord, 178.)

*Second.* The next objection which I am to consider is that founded upon the nature of the condition imposed in this case, that, namely, of banishment from the United States.

In support of this objection it is insisted that the power of

the governor is confined to the territorial limits of the State; that by this condition he is virtually extending his power beyond those limits and assuming to himself to dictate to other States whom they shall not have as residents among them.

There would be more force in this objection if the question before me grew out of any attempt of the executive to exercise his authority out of the State; if, for instance, finding that the prisoner was in one of the other States in violation of the condition of his pardon, he had demanded him as a fugitive from justice in respect to the offense to which that pardon applied, and had attempted forcibly or otherwise to withdraw him from another State, in order that he might be again subjected to the jurisdiction of this State in respect to that particular offense.

But such is not this case. The prisoner is lawfully within this State, and, being within it, its courts are required to enforce the laws against him. (*Case of Smith*, 1 Bailey, 283.)

Every appearance of impropriety is, however, dispelled the moment we come to consider the true nature of the pardon, and of the condition attached to it. It is in fact a contract between the sovereign power, as represented *quo ad hoc*, by the governor and the prisoner, that the former will release him from the offense and its consequences, and that the latter will withdraw himself from the United States.

In this light these conditions to a pardon have ever been regarded by the courts, and their practice has been in conformity therewith.

Almost, if not quite, every case cited on both sides on the argument take this view of it. 1 Chitty's Cr. Law, 773, states the doctrine which is sustained by all the authorities: "A pardon may be extended on any condition precedent or subsequent, on the performance of which the validity of the pardon will depend, and if he does not perform the condition it will be altogether void, and he may be brought to the bar, and remanded to suffer his original sentence."

The practice in England is, when the judge recommends to mercy, for the crown to signify its intention to pardon, and

The People v. George Potter.

then the court let him to bail to plead his pardon and *take his recognizance to perform the condition.* (1 Ch. Cr. L. 774; 1 Bl. Rep. 479, per Lord Mansfield; 1 Leach, 74; 15 East, 463; Bac. Ab. 456, Pardon, E.)

This is entering the contract, on the part of the prisoner, on the record.

In *Copeland's case* (Kel. 45) it was held that there was no power to commute the prisoner's sentence without his consent, and the only means of enforcing the condition was the infliction of the original sentence in case the criminal violated the conditions. But it is useless to multiply authorities where so many abound. A reference to a few will be sufficient. (2 Hawk. C. L. 37, §§ 59, 64, 65; 4 Bl. Com. 402; 5 Bac. Ab. 292, Pardon, E; 13 Pet. Ab. 82; Kelynge, 24; *Radcliffe's case,* Foster, 40; 1 Wilson, 214; Jenk. Cent. p. 12, *ca.* 62.)

In our own country the same doctrine prevails. In *Smith's case* (1 Bailey 283), the court say that the offender has a right to accept or reject the terms proposed. He may prefer to make the reparation demanded by the law, or the atonement substituted, *at his election.* The condition is, in effect, a contract, and to entitle the party to the benefit he must perform the condition, for that is the only conclusive evidence of assent to the grant, and, from its very nature, the thing must be done of his own accord.

In *Wilson's case* (7 Peters, 166), Chief Justice TANEY, then attorney-general, asserts that the whole current of authorities establishes this principle, that unless a party in some way claims the benefit of a pardon, thereby denoting his acceptance of the proffered grace, the court cannot notice it; and per MARSHALL, Chief Justice, in delivering the opinion of the United States Supreme Court, " A pardon is a deed, to the validity of which delivery is essential, and delivery is not complete without acceptance. It may be rejected, and if rejected there is no power to force it on him."

In a more recent case, that of the Canada prisoners, reported in 9 Ad. & Ellis, 731, Ld. DENMAN, in the Queen's Bench, treats the case as one where a man charged with crime is per-

mitted to obtain a pardon, by which his life is spared, but he binds himself to undergo a less severe punishment, and Ld. Abinger, in the same case (5 Mee. & Welsby, 49), says, if the condition was lawful, but the prisoner did not assent to it, nor submit to be transported, he cannot have the benefit of the pardon, and that if the condition on which alone the pardon was granted be void, the párdon must also be void. He also asserts that if the prisoner, having assented to it, his assent be revocable, we must consider him to have retracted it by his application to be set at liberty, and he is unable to avail himself of the pardon; he cannot plead the pardon which he has renounced, etc.

As we are then to regard the pardon and its conditions as a mutual contract between the criminal and the sovereign authority of the State, the remaining question is, what is the effect of a violation of the stipulations entered into on the part of the prisoner — does it render the pardon or only the condition void?

It is conceded on all hands that if it is a condition precedent, its non-performance renders the grant void. It has already been seen that where the condition is immoral, impossible or illegal, the condition will be void and the grant good, and it is contended in this case that the non-performance of a condition subsequent does not vitiate the grant.

Without multiplying authorities upon this point, I will content myself with referring again to the case of the Canada prisoners, merely premising that my researches have fully sustained the soundness of the position there assumed. (9 Ad. & Ell. 731; 5 M. & W. 49.)

The prisoners were convicted in the colonial courts, and sentenced to be executed. They were pardoned on condition of being transported to Botany Bay. In execution of this commutation of punishment they were sent from the upper to the lower province of Canada, and thence to England, whence they were to be transported to their destination. On their arrival in England they sued out a habeas corpus in the Queen's Bench, and afterward in the Court of Exchequer, and

their case was twice argued by some of the most eminent counsel in England. The case is not authority with us, but is referred to merely because it was elaborately argued, and the cases are there cited which establish as parts of the common law these positions:

That a man can assent to his own transportation when authorized by a statute.

That if the power to transport exists, it follows that there is a power to do all that is necessary to give effect to the condition.

That if the lieutenant-governor had no authority to impose the condition, the prisoner is in the situation he was in before.

That the pardon cannot stand upon any supposition which annuls the power to impose the condition.

And that if the condition upon which alone the pardon was granted, was void, the pardon must also be void.

I repeat, all the authorities, ancient and modern, in England and in this country, sustain these positions, and I know of no principle which would authorize me to disregard them. (*Maximilian Miller's case*, Leach Cr. L. 74; 2 Bl. Rep. 797; *Madan's case*, Leach, 223.)

In carrying out this principle it is held that a party is not restored to competency as a witness until he has performed the condition. (1 Ch. Cr. L. 775; Leach, 454, 498; Hob. 67, 82; 4 Har. St. Tr. 582; Holt, 688; Sir Thomas Ray. 379; 1 Ld. Ray. 39; 2 Hale P. C. 278; Com. Dig. Testmoyne, A 5; Bac. Ab. Par. H.)

And that any fraud in obtaining the pardon rendered it void, such as the *suggestio falsi* or *suppressio veri* (3 Inst. 238; Yel. 43, 47; Cro. Jac. 18, 34, 548; 2 Roll. Ab. 188; Dyer, 352, pl. 26; 1 Sid. 41; 3 Tomlins, 13); and within this category is included, in some of the cases, the instance of a prisoner asking for a pardon on conditions suggested by himself, and which he afterward disregards.

In this connection it will be necessary to note two positions assumed by the prisoner's counsel.

1. That the banishment imposed on Potter was a condition

subsequent, and that therefore its violation did not vitiate the grant. Without entering into the wide field thus opened to us, of the effect of conditions of this character, it will be sufficient to say that I fully accord with the constitutional court of South Carolina, in 1 McCord, 178, in holding that his leaving the United States was a condition precedent to the operation of the pardon, and as the violation of a condition precedent always avoids the grant, the non-performance of this condition renders the pardon merely nominal.

2. That as a person arrested upon a *ca. sa.*, in a civil suit, can never again be arrested by the prosecuting creditor, when voluntarily released by him, whatever may have been the conditions of his discharge, so, by parity of reasoning, one discharged from custody, when in execution on a criminal proceeding, cannot be recaptured. The parallel between the two cases is more apparent than real. In the civil proceeding, the caption is in satisfaction of the claim — such is the form of the writ — the sheriff is commanded to take the body in satisfaction, etc. It is not so in criminal proceedings. Will any one say that the caption of a murderer is a satisfaction of his condemnation to death, or that the mere arrest of a criminal is a satisfaction of the judgment which condemns him to imprisonment for life? In civil proceedings the arrest is the principal, and the detention is an incident, while in criminal cases the caption is the merest incident to the principal of continuing imprisonment.

*Third.* Having thus been led by the force of abundant authority, to the conclusion that the executive has power to attach conditions to his act of grace, and that the violation of those conditions renders the deed of pardon void, the remaining question is, whether the courts have any power to take cognizance of such violation. This point seems to be equally well settled by a long train of adjudications.

On the day that the prisoner was brought to this city from New Orleans, I was waited upon by the chief of police, who communicated to me the facts, and inquired whether it was

not his duty at once to deliver the prisoner to the keeper of the State prison.

While I was connected with the State prison, I had occasion to examine this question. I found among the documents at the prison the following opinion of the present chief justice, then attorney-general:

ALBANY, June 19, 1829.

GENTLEMEN: Your favor of the 16th was not received until this day. You ask my opinion of the course proper to be pursued in the case of a person found within this State after having been discharged from the State prison on a pardon conditioned that he shall leave the State.

The governor is authorized by statute, as well as by the common law, to grant a conditional pardon, and it is well settled that if a person be pardoned upon a condition, either precedent or subsequent, which he neglects to perform, the pardon is void, and he may be remanded to suffer his original sentence.

The statute has not prescribed any mode of proceeding in such cases. At the common law the offender may be arrested and committed to the common prison. An order is then made by the court in which he was convicted (or some superior court of criminal jurisdiction) that he show cause why execution should not be awarded against him on his former conviction. He is then put at the bar, the record of conviction produced, and it must appear that he is the same person. If he plead that he is not the same person, a venire to try that fact is awarded, returnable *instanter*, and if found against him, or if he confess that he is the person, the court order execution of the original sentence.

There are other questions (according to the nature of the condition) for the consideration of the court, as whether the prisoner has had proper time to comply with the condition — whether he has been prevented from doing so, by sickness, mental alienation, or the like, or, in case of banishment,

whether he had not been brought back forcibly and against his will.

The practice you mention as having obtained in such cases, of recommitting to the State prison, without any warrant or adjudication, is, in my opinion, neither warranted by law or a just regard to personal liberty.

I am, with great respect,

Your obedient humble servant,

GREENE C. BRONSON, Attorney-General.

GEORGE TIBBETTS, STEPHEN ALLEN and SAMUEL M. HOPKINS, Esqs., Commissioners, etc.

Acting upon the recollection of this opinion, I advised against the direct transmission of the prisoner to the State prison, and suggested the propriety of his being brought before the Oyer and Terminer, then in session, to the end that he might have an opportunity of pleading his pardon, duress, or aught else that might entitle him to his liberty, of which I deemed he ought not to be deprived without the opportunity of defense. He was accordingly brought before the Oyer and Terminer; a petition was filed, asking that he might be remanded in execution of his original sentence, and an order was entered committing him to custody until that question could be determined. Subsequently the Court of Sessions took cognizance of the case, and made the order in question, requiring him to show cause in that court why he should not be remanded. By what authority that court assumed cognizance of a case of which the court of superior jurisdiction had already obtained cognizance, I am yet to learn. That point was not argued before me by the counsel for the prosecution. They contented themselves with a general admission that the court of Oyer and Terminer had not jurisdiction of the matter.

I do not so understand the law. The opinion of Attorney-General Bronson is explicit that "an order is then made by the court in which he was convicted, *or some superior court of criminal jurisdiction,* that he show cause why execution

The People v. George Potter.

should not be awarded against him on his former conviction";
and so are the authorities. In *James' case* (2 Caines, 57), the
prisoner had been convicted of forgery, not in the Supreme
Court, but in some Oyer and Terminer, or General Sessions,
yet he was brought before the Supreme Court, as one of supe-
rior criminal jurisdiction, to show cause why he should not be
remanded under his former sentence. In *Sir Walter Raleigh's
case* (Cro. Jac. 495), he was attainted before commissioners,
yet brought before the King's Bench fifteen years afterward for
sentence. In *Radcliffe's case* (Foster, 40), he was convicted
in the Oyer and Terminer, yet thirty years afterward brought
up in the King's Bench and sentenced to execution. In *Rex* v.
*Rogers* (3 Burr. 1810), three felons convicted in the Oyer and
Terminer, were taken before the King's Bench for sentence;
and in *Miller's case* (2 W. Bl.), the prisoner, convicted at the
Old Bailey, and pardoned, was brought up before the King's
Bench, and remanded on his original sentence.

These cases, and numerous others, where the criminal had
made his escape before sentence, and was afterward brought
up to receive sentence, all confirm the opinion given by the
late attorney-general, that the court in which he was convicted,
or any court of superior jurisdiction, might pronounce judg-
ment upon the original sentence.

The Supreme Court, or the Court of Oyer and Terminer,
both being courts of superior jurisdiction, might entertain the
case, and, having possession of it, it was not competent for
the Sessions to interfere in the matter.

The Court of Sessions is a court of inferior jurisdiction,
limited in its powers mainly to those conferred by the statute,
but the Oyer and Terminer is a court known to the common
law, and under the common law is possessed of powers, and
charged with duties, beyond those defined in the statute. Of
those duties, one of the most important to personal liberty is
that of delivering the jail, of seeing that every person in con-
finement has an opportunity of having the cause of his deten-
tion inquired into. It is empowered to try and deliver

every prisoner who shall be in the jail when the judges arrive at the circuit town, whenever and before whomsoever indicted, and for whatever crime committed. (4 Bl. Com. 270). So that, one way or the other, the jails are in general cleared, and all offenders tried, punished or delivered, twice every year. A constitution of singular use and excellence. (Id.)

To enable the court to discharge this duty, it has been clothed with the power of bringing up to itself every thing pending in the Sessions, and so that no prisoner shall be removed out of its jurisdiction, there is an express prohibition against the allowance of a habeas corpus in a criminal case during its sittings, returnable elsewhere than in that court, unless issued by itself. (1 R. S. 758, § 27.) And as it must frequently happen, as it has happened in times past, that the court, at its coming, or during its session, shall find in custody persons upon whom judgment has been pronounced, but sentence not yet executed, so it must, in the discharge of its high duty of delivering the jail, exercise the power which the court has in such cases exercised for very many years, at least since the days of Queen Elizabeth.

But the question raised by the prisoner's counsel is not, which court has power to remand him on his original conviction — it assumes a broader, bolder ground, and denies that any court has that power. I was not referred to any case that sustains that denial, but I have found many that maintain the converse of the proposition. *James' case* (2 Caines), *Smith's case* (1 Bailey), *Fuller's case* (1 McCord), *Wilson's case* (7 Peters), are all cases in this country, where the power is recognized and enforced, and the common law authorities are abundant and explicit on the point. (*Watson's case*, 9 Ad. & Ell. 731; 5 Mee. & W. 49; *Miller's case*, Leach, 74; *Madan's case*, id. 223; *Rex* v. *Miller*, 2 Bl. Rep. 797.)

In *Miller's case*, in 1771 (Leach, 74), the prisoner was indicted for being at large, contrary to the conditions of his pardon; but in *Madan's case*, in 1780 (Leach, 223), the prisoner was ordered to show cause, as suggested in the attorney-general's opinion, and a jury summoned instanter to try the

The People v. George Potter.

question of identity, and on their finding he was remanded on his original sentence. And so in *Radcliffe's case* (Foster, 40), where the prisoner was ordered for execution when thirty years had elapsed since his conviction.

In those cases it is distinctly ruled that the prisoner having broken the condition, he remained in the same state in which he was at the time the pardon was granted, viz.: under sentence, and should be remanded to his original sentence. In some of the cases the prisoners were executed in the exercise of this authority. And in one case, it is said, the circumstances confer the authority, and no warrant could enlarge it.

Why should it not be so? Are our courts so imperfectly organized, that a felon under sentence of death or imprisonment, can seek for and obtain a remission of his offense on conditions proffered by himself, and then, violating the conditions, be permitted to set the authority of the State at defiance, and say there is no power to punish the fraud he may have perpetrated, or to enforce the contract he may have made?

The authority of the law is not so imperfect, but in criminal, as well as in civil proceedings, it may be invoked to enforce the dictates of common sense, and the obligations of good faith.

Under the view which I have thus taken of the case, the prisoner must be remanded to custody, and the district attorney will draw up an order accordingly.

On a subsequent day the prisoner was brought up in the Court of Oyer and Terminer and asked whether he had any cause to show why he should not be remanded in execution of his original sentence, to which he pleaded he was not the same person. To try that issue a jury was impaneled, and their verdict being against him, an order was thereupon entered remanding him to the State prison, in execution of his original sentence.

An application was afterward made to the Chief Justice of the Supreme Court for the allowance of a certiorari to remove into that court the proceedings before the circuit judge on

the habeas corpus, which was granted, but the Chief Justice refusing to stay the proceedings thereon, and expressing his concurrence in the opinion pronounced, no farther steps were taken in the matter, and the prisoner was accordingly remanded to the State prison.

[NOTE.—The new Constitution, which was adopted in November, 1846, having this question in view, contained the following clause, a part of which was not in either of the preceding Constitutions of this State:

"Art. IV. Sec. 5. The governor shall have the power to grant reprieves, commutations and pardons, after conviction, for all offenses except treason and cases of impeachment, upon such conditions and with such restrictions and limitations as he may think proper," etc.]